[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is a dissolution of marriage wherein the parties intermarried in West Hartford, Connecticut on July 5, 1980. The testimony was that the plaintiff has resided continuously in the State of Connecticut for at least one year preceding the date of the filing of the complaint. The testimony further showed that there is one minor child, issue of the marriage, Tiffany Elizabeth Wandy, born May 4, 1983. Also, evidence was presented that the marriage of the parties has broken down irretrievably.
This has been a hotly contested dissolution. The primary fight between the parties is over custody of the minor child. The child, who is a female of eleven years of age, is currently residing with the father in Glastonbury and attends the Glastonbury school system. The mother currently resides in Granby, Connecticut, approximately 20 or 25 miles from the family residence in Glastonbury and on the highway at least a 25 to 35 minute drive away. The mother resides in a rented condominium and the husband maintains his residence in what had been the marital home prior to the separation of the parties.
There has been presented, through the testimony, that there is a serious reluctance on the part of daughter to leave Glastonbury and live with her mother. Many reasons are cited. Primarily, the fact is that she does not want to leave the family home and she does not want to leave the Glastonbury school system. A major contributing factor is also a reluctance to leave her pony, which was purchased by the father subsequent to the mother leaving the family premises. This particular purchase will be discussed hereafter in the discussion of problems arising concerning this marriage. Another reason given is that though the mother was the primary caretaker of the daughter during the marriage there has arisen between the mother and daughter a severe problem concerning their ability to get along with each other. There has been some indication that the problem arose as a result of her mother bringing the divorce action and breaking up the family home as perceived by the child. There are serious allegations in that a lot of this was fueled by the father discussing the breakup of the marriage and the problems arising as a result of the dissolution with the child, even though he was ordered not to discuss these things with her.
Probably a fast review of the marriage would help. The CT Page 10026 parties are both college graduates and this is a second marriage for the plaintiff and a first marriage for the defendant. At the time of the marriage the defendant worked as a salesman selling building supplies of one sort or another. After the marriage, the defendant went to work for the plaintiff's father who owned a coffee service business. He worked for the business for about a year or slightly longer and at one point the plaintiff's father left on vacation. Prior to his departure, he spoke to the defendant about servicing a particular client and wanted to make sure he was properly taken care of while the owner of the business was away. Upon his return, he discovered the defendant had not serviced the particular customer and proceeded to lecture the defendant for not doing his job and then fired him.
The defendant blames his discharge upon a brother-in-law who was in the business and whom he perceived as being concerned because he believed the defendant was trying to put himself in a position to take over the business. As a result of the firing, the plaintiff went to the father to discuss the situation and evidently seek the rehiring of her husband. This did not occur and as a result the plaintiff became estranged from her father and remained so for several years until the father contracted cancer. Because her father had cancer and might be terminal, the plaintiff tried to reestablish some relationship with him but he passed away shortly thereafter. Subsequently, the plaintiff found out that she had been cut out from her father's estate as a result of her taking the defendant's side.
The defendant went back into the same business that he had learned from his father-in-law and according to the plaintiff it was merely an attempt to seek revenge on her father and try to run him out of business, according to statements that she attributed to the defendant. However, she did go along with his plan and was actually a half owner of the new business.
The business was financed through a loan made by the plaintiff's maternal grandmother. It was a loan for $32,000.00 and was the major factor in plaintiff becoming a half owner of the business. During this whole period of time the plaintiff had been working and during the start up process of the new business she was the main provider for the family through her employment at American Airlines. CT Page 10027
In the same time frame, plaintiff became pregnant with the child who is the issue of the marriage. This evidently disturbed the defendant as he felt that since they were starting out in business it was not a good time for her to become pregnant and start a family. This caused some difficulty between the parties.
The plaintiff's father passed away approximately two years later and this caused the plaintiff to have great feelings of guilt because she had not been successful in reestablishing a new, warm relationship with her father who was still angry about the parties going into competition with him. Shortly thereafter her grandmother died and again this was an area of grief for the plaintiff. She was upset by the fact that the defendant was not supportive of her, during this period of grief.
Again within the same time frame, the plaintiff became pregnant again and somehow, according to her, the defendant was the first to learn that the baby suffered from a chromosomal deficiency and he made the decision that the child should be aborted. He then passed the news onto the plaintiff who claims to have been devastated by this. Again she was upset by the defendant's unilateral decision on how to proceed with the problem. The plaintiff had suffered the loss of her father and a child and her grandmother in a short period which caused her some psychological problems.
From this time forward, the marriage of the parties seemed to be one of a matter of just getting along together and maintaining a home, in short a marriage of accommodation. Some time in the late 80's the plaintiff was again employed by American Airlines in the reservation department. After a few years, she was given a job transfer to Bradley Airport in the area of Cargo Reservation. She considered this a promotion as she had a job that gave her more responsibility and authority. However, the job had serious drawbacks as it required her to work nights. However, this also meant that she was able to be at home with her child and provide day care for the child while the father was at work. At night the roles were reversed and the defendant father provided care for the child while the mother was working.
Also, sometime in this particular span of time, the CT Page 10028 parties purchased their first home in Wethersfield, this was in June of 1985, the purchase price was $87,500.00, the mortgage was somewhere between $60,000 and $65,000 and the down payment came primarily from the plaintiff's grandmother. The down payment funds would have been approximately $22,500.00 or $27,500.00, most of which was supplied, as noted earlier, by the plaintiff's grandmother.
There was another occurrence that happened about the same time as the second pregnancy occurred. The defendant was given some medication by his wife for treatment of a disease known as chlamydia. Chlamydia is a sexually transmitted disease, sometimes classified as a venereal disease, and in most instances transmitted by the female to the male. However, the genesis of the infection in the female does not necessarily come from sexual activity. It can be caused by other types of infections. However, the defendant proceeded to treat this as though the plaintiff had been sexually promiscuous and had engaged in extra marital activities, in order to incur the infection and then pass it on to him. This was an assumption on his part and there was no proof as to how or why she originally incurred the infection.
There were further allegations of a more recent affair with a one Tim Eagan, the allegation about both of them being in Phoenix, Arizona at about the same time. The source of the defendant's testimony was not severely tested in cross-examinations, but in any event there was absolutely no corroboration of any affair with Mr. Eagen. Though such an affair could have been possible, there was nothing to indicate that there was anything more than a business relationship as they both were employed at American Airlines.
Both parties changed attorneys close to the time that the trial began. Prior to that there was at least one motion and two stipulations signed referring to a restraint against the defendant from discussing the merits or causes of the dissolution with the minor child. It seems that up to the time of the separation or breakup of the marriage of the parties the mother had been the primary custodial parent with no problems in her relationship with the minor child. Subsequent to the commencement of the dissolution, the child developed a great amount of animosity towards her mother and blamed her for the breakup which led the plaintiff to believe the child was discussing the matter with the father. CT Page 10029
There was also some indication that at times the minor child, a female, had been sleeping nights in her father's bed which would be a rather unhealthy situation in the eyes of the court. The child seems to be an extremely bright young lady who has expressed a great desire to remain in her home in Glastonbury, a strong desire to remain in her school in Glastonbury, and a desire to remain in Glastonbury because that is where her horse is stabled, close to home. The horse, or pony, raises an interesting problem with the court. At some point in time, the child had been receiving lessons in horsemanship on a horse leased by the parties. Subsequent to the wife's leaving the marital home and moving to Granby a horse, or pony, was purchased for the child by the defendant and stabled in a riding stable not the same as where the child had received her prior lessons. There was a question as to the amount that was paid by the defendant or the defendant's parents for the horse but even forgetting that aspect the problem that presented itself is that there arose a perception on the part of the plaintiff that this was another attempt by the father to bring the child closer to him and further the alienation between the plaintiff and the minor child
The child as earlier indicated has a strong desire to remain in Glastonbury. This is understandable because remaining in Glastonbury in the family home, remaining in her school which is familiar to her, remaining in the town where her friends reside and remaining in the town where her horse is stabled are all important to an eleven year old and give her life a degree of stability. It is known that children do have a fear of the unknown, such as moving. However in a society which is as mobile as ours is today, children who have the same fears as this young lady are frequently forced to move because of economic conditions or job changes in their parents economic position, or because of family dissolutions. Being children they resist the move because they hate to face up to it. But because they are children, they are extremely adaptable and do adjust to moves. This means that the court will not place as much emphasis on the child's reluctance to change as others have in this case.
There is a further factor in this dissolution that has aroused a lot of controversy between the parties and that is over the value of the house and the sale of house. The house was originally purchased on or about October, 1991 when they CT Page 10030 sold their Wethersfield home. The original purchase price on the Glastonbury property was $254,633.00. There have been varying figures tossed around about the current value of the house but it has been appraised at $226,000.00 by a professional appraiser. Real estate agents have placed other values on it. There is no question that the property has depreciated since it was purchased due to the economic downturn in real estate in the last few years. The property has been described as tired looking. In other words, there is nothing wrong with the property structurally, only that it has not been maintained as well as it might have been both on the interior and exterior. Questions of whether or not grass has been allowed to get too long or weeds been allowed to remain in certain areas for too long a period of time is an example of the things concerning the plaintiff. There is a question as to whether or not all the rooms have been painted and taken care of as they should be.
Another area of concern is that the house has two bedrooms and a sleeping loft and the question is whether or not the house should be advertised as a two bedroom house or a three bedroom house since the loft is at the highest level in the residence and is used exclusively as a sleeping area. It could easily be closed off and made into a separate bedroom if that became necessary. This has become one more area of dispute between the parties.
The first home of the parties had been in Wethersfield and that had been purchased in June 1985. Approximately $25,000.00 was used as a down payment and most of that came from the plaintiff's grandmother, as herein before noted. Upon sale of that property they realized $50,000.00 in cash which was all placed into the Juniper Lane property. That was most of the equity that they had in the Glastonbury property. The mortgage at the time of the purchase in Glastonbury was $190,000.00 and they put in $64,633.00 which would have been the cash difference between the purchase price and the mortgage.
The house has been on the market for over two years and they have not received any offers even close to the desired price. The defendant wants a right of first refusal on the home. Having such a refusal in the listing agreement causes problems for potential buyers. Defendant has made the plaintiff no offer towards buying out her interest and CT Page 10031 contests what her interest is in the house. This would necessarily have him overlook the $22,500 or $27,500 cash that was placed in the Wethersfield property and was mostly as a result of a gift from the plaintiff's grandmother. He would have liked the court to find a value of the Glastonbury property to be about $210,000.00 which would make it very convenient for him to purchase what he considers the wife's equity in the premises, or one-half of $20,000.00.
There is another area that the defendant has conveniently forgotten about, that being the fact that when he was fired by his father-in-law and decided to go into business in competition with his father-in-law, in order to wreak his vengeance on him for having been fired, the start up money for the new business again came from the plaintiff's grandmother. As a result of this, she was made a 50/50 partner and has participated in the proceeds of the sale of the business though there is a question whether or not the sale was for an amount less than what he originally needed to set up the business. The payout on her share of the business will terminate on January, 1995. However, his current compensation and commissions do apply to accounts he brought in from his business and placed into his current employers business, all accrued while the wife was a partner.
It is true that he was the main contributor to the old business which was owned by both he and his wife, but accounts and commissions paid after January, 1995 will accrue solely to his benefit and not to the plaintiff's benefit though those accounts, for all intents and purposes, were owned half by her. She did do the bookkeeping for the company, so her participation was not of a completely negative value. She did participate to a small extent in the operation of the business. However, she seems to accept her end of participation in the business and the court will not interfere in this aspect of the marriage.
The character of the plaintiff has also been put into issue, not only in relation to her extra-marital relation with Mr. Eagen, but also in fact that she was the sole driver of a 1991 Toyota Camry which was purchased by the parties. The car had been driven as the records show, for approximately sixteen or more thousand miles. There was an attempt on the part of the plaintiff to trade the car for a Ford Explorer but there were some problem and she abandoned the car some place in West CT Page 10032 Hartford. The defendant picked up the car and ultimately sold it to his parents but it was interesting to note that at the time he picked up the car the odometer had allegedly been tampered with and turned back to 6 thousand plus miles. This was all done while in the possession of the plaintiff.
There was also something about a lost diamond ring and the fact that the plaintiff collected the insurance proceeds for this ring. There was an indication that this was not the first time the plaintiff had sought recovery for lost jewelry. There was further some indication that the defendant had bought a substantial amount of jewelry after the separation from her husband and that was included in some accounts which she claims are family debts and which she is currently paying off at the credit union for employees of American Airlines.
There was also an allegation on the part of the defendant to indicate that at a time early in their marriage the plaintiff might have invested in some type of drug deal with her brother resulting in the loss of a substantial sum of money. The connection however was rather tenuous when taken in context with other things brought out about the plaintiff.
All in all trial seemed to point out these parties created a rather dysfunctional family and dissolution is the best solution for them. The big problem remains in what to do with the child relative to custody, visitation and support and what to do about the house and how to try and equalize the income of these parties for a period of time.
The court is going to tackle what it considers the most difficult and probably the most important issue in this dissolution first, that being the custody of the minor child. The court feels that the present schedule of visitation and custody is a very destructive of the need for some stability in the life of the minor child. The court is going to grant at this time joint custody of the minor child to both parties. The child's primary residence shall remain for now with the father, that is so the child does not change her school this year. Visitation with the defendant shall be from Friday at 4:00 P.M., or as close thereto as the defendant can get the child to Granby through Monday morning when the plaintiff will deliver the child to her school. This shall occur on three weekends of every month when there are four weekends and shall occur on four weekends in any month in which there are five CT Page 10033 weekends, which leaves the father just one weekend per month with the child. The parties shall alternately share holidays on the following dates: New Year's day, President's Day, Easter Sunday, Memorial Day, July 4, Labor Day, Thanksgiving, Christmas Eve and Christmas Day. The plaintiff, if she can arrange for time off shall have the child over the Christmas Vacation and during Spring Vacation. The plaintiff shall further have the child after school is out for next summer for a period of eight weeks. Plaintiff shall further have the child one evening every other week for an overnight visit between the mother and the child. The court will order continued counselling for mother and daughter with their current counselor or a counselor of their choice so that they can reestablish and mend the bonds that have been broken by this dissolution.
The testimony of Dr. Rossamonda and others involved was that there has been a substantial improvement in the relationship. The court is hopeful that the bond between the plaintiff and the minor child can be reestablished to the point where the court would take a look at the relationship sometime after school adjourns for the year in 1995 and study whether or not there maybe a possibility for a change in the primary residence of the minor child.
The court suggests this because Dr. Rossamonda did testify that a female child of this age probably relates better and closer to the mother. There are a number of reasons why the court feels the child should be with the mother when entering her adolescent years. The child will certainly be undergoing some physiological changes in her body and it would seem that the mother is a much more appropriate person with whom to discuss these things. Also the child may show some reluctance or reticence in discussing these things with a male even though it is her father. If a change can be effected in the child's primary residence sometime in the future the court feels this would not be of serious consequence to the child's mental status as children are very adaptable to change.
The major move that would probably have to occur if the change were to take place is that the horse would have to be transferred from Glastonbury to someplace nearer to the mother's place of residence. The court would hope that the defendant will do nothing to alienate the child from her CT Page 10034 relationship with the plaintiff during the next years.
The next thing to be dealt with is the disposition of the family home. The court, based upon the testimony of the real estate appraiser will find that the marital home is valued at $226,000.00, which would leave an estimated equity of about $38,000.00. If the father insists upon purchasing the home he will have the right to do so for ninety days from the date of this memorandum and the court is going to order that the defendant pay within that ninety day period the sum of $31,000.00, that being based upon the original funds coming from the plaintiff's grandmother, $25,000.00 plus one-half of the remaining equity which would be $6,000.00. If the husband fails to make said payment within the next ninety days, the house will be sold with no rights of first refusal in either party and the plaintiff shall receive $31,000.00 out of the proceeds of the sale of the premises less her share of the cost of sale. From the plaintiff's monies that she would receive out of the house, whether her husband purchases it from her or whether it is sold, there should be deducted her half interest for her share of the water lien which was $6,230.00, her half being $3,115.00.
Much was made about the fact that the financial affidavits were not correct and did not show true income to the parties. In fact, the affidavits were incorrect in some aspects as to the earnings but not in a major amount for both parties. Using the affidavits and also using the testimony and evidence that came in, the court will find that the true income for the plaintiff was $36,000.00 per year and the true income for the defendant was actually $72,000.00 per year, so that they were earning about 2 to 1 in favor of the defendant. Using these figures for determining child support in accordance with the state child support guidelines the court will find that the weekly obligation for support of the child would be $278.00, one third of which would be the wife's, or $92.67 per week and the defendant's obligation which would be $185.34 per week.
Since the child for at least the next 10 months will be primarily residing with the defendant father, the plaintiff wife will be ordered to pay to the defendant husband the sum of $92.67 per week towards child support. Support will be suspended during the vacation periods spent with the wife, in excess of one week. CT Page 10035
The wife has a pension and the accrued annual benefit as of December 31, 1993 was $6,467.00. The plaintiff will execute to the defendant a QUADRO giving him 40% of the benefit of $6,467.00. There has been a deduction in the amount of the husband's entitlement in this matter since the pension started prior to the marriage to the plaintiff.
The defendant husband has listed in his debts a sum of $28,771.00 as a potential capital gain on the sale of the family home in Wethersfield in 1991. The court is hard pressed to find the rationale for the parties possibly owing a capital gain on the $28,771.00 The court's computation indicates that there was a gain on the sale of the property of approximately $50,000.00 but that the parties invested approximately $64,500.00 into the Glastonbury property. Since they are entitled to re-invest in real estate there would be no capital gain on the sale of the Wethersfield property. As a matter of fact, the sale price set on the Glastonbury property is approximately $28,000.00 less than was invested in the Glastonbury property, so that at this point in time there would be a wash on the gain of the Glastonbury property. This leaves the defendant with liabilities of approximately $35,000.00 which is pretty close to the $34,229.00 the plaintiff lists as her liabilities. Taking into consideration that some of her liabilities included on American Airlines Credit Union debt which was used for the family, these liabilities come out fairly equal.
The plaintiff further shows assets of approximately $41,222.00 and the defendant shows assets of $30,910.00. There is a difference in the equity shown in each case on the house. The defendant used a figure $8,000.00 less than that of his wife which would reduce her assets to $33,222.00. Accordingly, there is no large discrepancy between the amount of assets held by each party. As a matter of fact, part of some of the assets shown on the plaintiff's affidavit indicate $866.00 put away for the children's education which would reduce the difference even more. Since the differences are so small, comparatively, on the assets and the liabilities, the court will do nothing about rearranging the liabilities or the assets of either party.
Also, there were some problems relative to property removed from the marital home. The plaintiff is hereby CT Page 10036 ordered to return, at her own expense, the refrigerator she removed and one of the bunk beds belonging to her daughter.
Each of the parties is hereby order to pay $3,250.00 to Attorney Cynthia Houck, attorney for the child, within 45 days of this order.
The horse, having been bestowed upon the daughter by the defendant, he shall have the sole responsibility of maintaining the horse as long as the child maintains her primary residence with the father. If the primary residence of the minor child changes, to the mother, and the horse is moved to the proximity of the mother's place of residence, then the cost of boarding and maintaining the horse shall be borne equally by the parties.
All items as shown on Exhibit A attached to the plaintiff's proposed orders shall be returned to the plaintiff, with the exception of Item 16 (the lawn mower) which the defendant shall retain as his own.
The plaintiff will continue to maintain the minor child on her health insurance policy. If such a policy equal to or better than the plaintiff's becomes available through the defendant's place of employment, the plaintiff may drop her coverage of the minor child and the defendant shall be responsible for said coverage. In any event, the parties shall be equally liable for any unreimbursed medical, dental, orthodontic, psychological, psychiatric, costs. The parties shall remain responsible for their own counseling costs with the minor child, in regard to the parenting problems presented by this dissolution.
Each party shall remain liable for their own attorneys fees.
This was a marriage of approximately 14 years, though it probably was not a very viable marriage after the first 10 years. The court will order alimony for a period of 5 years payable $200.00 per week during the first year, payable at the rate of $175.00 per week for the next 2 years and payable at the rate of $150.00 per week for the last two years. Based upon all of the foregoing, the court will make the following findings: CT Page 10037
The parties intermarried at West Hartford, Connecticut on July 5, 1980. The plaintiff has resided continuously in the State of Connecticut for at least one year next prior to the date of the filing of the complaint. There is one minor child issue of the marriage, Tiffany Elizabeth Wandy, born May 4, 1983 and the marriage of the parties has broken down irretrievably. Accordingly the court will enter a decree dissolving the marriage and orders relative to custody, distribution of the estate, alimony, support and disposition of the marital home shall be made in accordance with the above memorandum.
Kline, State Trial Referee